USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __3/22/2023__

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Manuel Pichardo,** | |
| **Plaintiff,** | **21-cv-06873 (SDA)** |
| **-against-** | **OPINION AND ORDER** |
| **Commissioner of Social Security,** | |
| **Defendant.** | |

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Manuel Pichardo ("Plaintiff" or "Pichardo") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Compl., ECF No. 1.) Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. (Pl.'s Mot., ECF No. 23; Comm'r Cross-Mot., ECF No. 33.)

For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is DENIED and the Commissioner's cross-motion is GRANTED.

**BACKGROUND**

**I.     Procedural Background**

Pichardo filed an application for DIB on January 13, 2017, and an application for SSI on January 25, 2017, with an alleged disability onset date of January 9, 2017. (Administrative R. ("R."), ECF No. 12, 274, 281.) The Social Security Administration ("SSA") denied his applications on March 23, 2017 and Pichardo filed a written request for a hearing before an Administrative Law

Judge ("ALJ") on April 5, 2017. (R. 147-49, 167-69.) A hearing was held on April 25, 2018 before ALJ Seth Grossman. (R. 71-123.) In a decision dated May 11, 2018, ALJ Grossman found Pichardo not disabled. (R. 58-67.) Pichardo requested review of the ALJ's decision from the Appeals Council. (R. 273.) His request for review initially was denied on June 27, 2018 and, after further consideration, denied again on December 6, 2018. (R. 1-4, 1166-68.)

On January 11, 2019, Pichardo filed an appeal in this Court. (R. 1230, 1233-35.) The parties subsequently agreed to remand the first case for further administrative proceedings, and, on April 5, 2019 the Court endorsed the stipulation of remand. (R. 1243-44.). Based on the Court's Order, the Appeals Council issued an Order, dated August 15, 2019, vacating the final decision and remanding the case for further consideration. (R. 1249-52.) ALJ Elias Feuer held a hearing on February 25, 2020, at which Pichardo appeared unrepresented. (R. 1175-1204.) ALJ Feuer took the testimony of a medical expert and then adjourned the hearing for Pichardo to determine whether he wanted to obtain representation. (R. 1180.) ALJ Feuer held a second hearing on July 23, 2020, at which Pichardo was represented by counsel. (R. 1206-28.) By decision dated April 23, 2021, ALJ Feuer found Pichardo not disabled. (R. 1146-59.) Plaintiff did not file written exceptions with the Appeals Council and thus ALJ Feuer's decision became the Commissioner's final decision. This action followed.

## II.   <u>Non-Medical Evidence</u>

Born on June 28, 1984, Pichardo was 32 years old on the alleged disability onset date. (R. 124.) Pichardo has less than a high school education[1] and past relevant work as a parking valet and kitchen helper. (R. 630-31.)

## III.   <u>Medical Evidence Before The ALJ[2]</u>

### A.   <u>January 2017 FEDCAP WeCare[3] Evaluation – Dr. Hun Han, M.D.[4]</u>

On January 9, 2017, Dr. Hun Han, M.D. of FEDCAP WeCare evaluated Pichardo and completed a "FEDCAP Biopsychosocial Summary WC II" report summarizing his findings. (R. 636-65.) Dr. Han found that Pichardo would have non-exertional work limitations in understanding,

---

[1] The record contains conflicting evidence regarding Pichardo's education history. (*See*, *e.g.*, R. 77 (Pichardo's testimony that he completed 7th grade in the Dominican Republic in regular education), 629 (FEDCAP report indicating Pichardo completed 11th grade in the Dominican Republic), 799 (reporting leaving school in third grade and being in special education); *see also* R. 1152 n.2.) There is no dispute, however, that Pichardo had less than a high school education. (*See* Pl.'s Mem., ECF No. 24, at 16 ("He did not graduate high school.") (citing R. 307 (Disability Report indicating Pichardo completed 11th grade)); Comm'r Mem., ECF No. 34, at 19 (discussing conflicting evidence regarding Pichardo's education history).)

[2] Pichardo does not challenge the ALJ's determination that Pichardo can perform light work. (*See generally* Pl.'s Mem.; *see also* Comm'r Mem. at 4 n.5, Pl.'s Reply Mem., ECF No. 35 (remaining silent as to physical RFC findings).) Accordingly, the Court address only the medical evidence regarding Pichardo's mental impairments.

[3] FEDCAP WeCare is the New York City Human Resources Administration's Wellness, Comprehensive Assessment, Rehabilitation and Employment program, "a social services program designed to assist individuals to transition off cash assistance" *Feliciano v. Comm'r of Soc. Sec.*, No. 21-CV-01800 (AMD), 2022 WL 4646496, at *2 (E.D.N.Y. Sept. 30, 2022), which, "focuses in part on assisting eligible individuals to obtain federal disability benefits." *Hubbard v. Comm'r of Soc. Sec.*, No. 18-CV-03119 (RWL), 2019 WL 3940150, at *7 n.14 (S.D.N.Y. Aug. 5, 2019) (citing https://www.fedcap.org/content/wecare).

[4] Prior to the alleged onset date, on or about January 3, 2017, Pichardo also saw Dr. Beatrice Spinelli, another doctor at FEDCAP, for a psychiatric evaluation. (R. 669-76.) The ALJ separately considered Dr. Han's opinion, which was dated on the alleged onset date, but not Dr. Spinelli's, which was dated several days earlier, even though it appears that the evaluation process occurred between December 27, 2016 and January 9, 2017. (*See, e.g.*, R. 653 (Dr. Han signature dated Dec. 27, 2016 referring case to Dr. Spinelli for psychiatric evaluation).) In any event, the mental findings in Dr. Han's opinion mirror the findings from Dr. Spinelli's evaluation. (*Compare* R. 656-59 *with* R. 670-76; *see also* Pl.'s Mem. at 25 (noting assessments are "almost identical"); Comm'r Mem. at 25.)

remembering and maintaining attention, tolerating stress, adapting to changes, regulating emotions and relating appropriately to coworkers/accepting supervision. (R. 656-57.) Dr. Han indicated that Pichardo had learning problems and was paranoid around people. (R. 656.) Dr. Han also found that Pichardo would have limitations in maintaining energy, sustaining attendance and achieving adequate work pace and production, noting that he was "forgetful." (R. 658.) In terms of work accommodation, Dr. Han found that Pichardo would need frequent breaks and a low stress environment. (*Id.*) Dr. Han opined that Pichardo had restrictions of activities of daily living that prevented adherence to a regular work routine, which prevented employment. (R. 661.)

### B.    January 2017 Treatment Records – New York State Psychiatric Institute

On January 9, 2017, Pichardo saw psychiatrist Dr. Andrew Kirsch for medication management.[5] (R. 1677.) During the visit, Pichardo reported feeling more "down and depressed" during the past month, to which he attributed having been physically attached at the homeless shelter where he had been residing, as well as the holidays and a visit with his sister, which caused him to realize how isolated he was and how little he had. (*Id.*) He reported taking Adderall as prescribed to good effect. (*Id.*) On mental status examination, Dr. Kirsch noted that Pichardo was well groomed; casually dressed; had no psychomotor agitation or retardation; had good eye contact; spoke at a regular rate, rhythm, and volume; and displayed no abnormal involuntary movement. (*Id.*) Dr. Kirsch further noted that Pichardo's mood was "down, depressed[;]" his affect was full and reactive, but he appeared more worried about his situation; his insight was

---

[5] Pichardo first saw Dr. Kirsch in 2013, following a suicide attempt. (R. 1585.) The Court focuses on the medical evidence between the alleged onset date, January 9, 2017, and April 23, 2021, the date of ALJ Feuer's decision.

fair; his judgment was fair; and his thought process was linear and logical. (*Id*.) Pichardo denied having auditory hallucinations, visual hallucinations, suicidal ideation, homicidal ideation and delusions. (*Id*.) A note from social worker Quisqueya Meyreles on the same day also indicated that Pichardo continued to feel anxious about his living situation.[6] (R. 1066.)

Under diagnostic impression Dr. Kirsch noted personality disorder, unspecified, with prominent narcissistic and borderline traits; adjustment disorder, unspecified, with depressed mood, anxiety and disturbance in conduct; attention deficit hyperactivity disorder ("ADHD"); and major depressive disorder by personal history of symptoms. (R. 1677.) Dr. Kirsch continued Pichardo on Sertraline, Gabapentin, Adderall and Trazodone. (R. 1678.) Dr. Kirsch noted that Pichardo's goals were to develop skills to deal with acute anxiety; to understand the connections between events and sudden changes in his mood and negative thinking; to stay away from conflict; to manage negative thinking and to look at obstacles Pichardo created to achieving his goals. (*Id*.) For counseling, Dr. Kirsch continued to review skills for staying out of trouble and avoiding conflict. (*Id*.)

**C.      February 21, 2017 Psychiatric Consultative Examination – Dr. John Nikkah, Ph.D.**

Picardo saw Dr. John Nikkah, PhD. For a psychiatric consultative examination on February 21, 2017. (R. 799-804.) Upon mental status examination, Dr. Nikkah found that Pichardo was cooperative, but his overall manner of relating was fair and he needed repetition of evaluation questions on a few occasions due to problems with comprehension and distractibility. (R. 801.) Dr. Nikkah noted that Pichardo was adequately groomed and had appropriate eye contact, fluent

---

[6] In addition to his treating psychiatrist, Pichardo also saw social worker Meyreles throughout 2017 and 2018. (*See, e.g.*, R. 20-22, 824, 889-90, 893-94, 944, 1582-83.)

and clear speech and coherent and goal-directed thought processes. (*Id*.) Pichardo's affect was restricted and his mood was neutral. (R. 802.) Dr. Nikkah noted that Pichardo was oriented to person and place, but not to time. (*Id*.) With respect to attention and concentration, Dr. Nikkah found that they were moderately impaired due to a combination of distractibility and limited intellectual functioning. (*Id*.) Pichardo's recent and remote memory skills were impaired for the same reasons. (*Id*.) Dr. Nikkah deemed Pichardo's intellectual functioning to be in the borderline range with a "somewhat limited" general fund of information and his insight and judgment to be poor. (*Id*.)

Dr. Nikkah opined that Pichardo was moderately limited in his ability to understand, remember or apply simple directions and instructions; interact adequately with supervisors, coworkers and the public; and be aware of normal hazards and taking appropriate precautions. (R. 803.) Dr. Nikkah opined that Pichardo was markedly limited in his ability to understand, remember or apply complex directions and instructions; use reason and judgment to make work-related decisions; sustain concentration and perform tasks at a consistent pace; and regulate emotions, control behavior, maintain wellbeing and maintain personal hygiene and appropriate attire. (*Id*.) Dr. Nikkah further opined that Plaintiff had extreme limitations in his ability to sustain an ordinary routine and regular attendance at work. (*Id*.) Dr. Nikkah noted that the "[r]esults of the examination appear[ed] to be consistent with psychiatric and cognitive problems, and this may significantly interfere with [Pichardo's] ability to function on a daily basis." (*Id*.)

### D.   February 2017 Treatment Records – New York State Psychiatric Institute

On February 28, 2017, Pichardo visited Dr. Kirsch for medication management. (R. 1680.) Pichardo reported that his mood was "ok" and that he was provided with a housing voucher rent

and a deposit. (*Id*.) He stated that felt overwhelmed about having to find an apartment on his own due to his poor English skills. (*Id*.) Dr. Kirsch noted that he revisited discussions he had had with Pichardo over the years about the importance of improving his English skills in order to be prepared for this type of situation. (*Id*.) Dr. Kirsch also noted that Pichardo's case manager was guiding him through the process of obtaining an apartment. (*Id*.) Pichardo expressed frustration with the homeless shelter system and his inability to afford his expenses. (*Id*.) He complained about not being able to provide for his son. (*Id*.) He told Dr. Kirsch that he had not been able to follow through with English classes. (*Id*.) Pichardo reported having a good appetite and energy level. (*Id*.) He reported taking the allergy medication Zyrtec to help him sleep better at night. (*Id*.) Dr. Kirsch noted that Pichardo had elevated cholesterol and a mild tobacco use disorder. (*Id*.)

### E.    <u>March 10, 2017 State Agency Psychological Consultant – S. Juriga, Ph.D.</u>

On March 10, 2017, State Agency psychological consultant Dr. S. Juriga, Ph.D. completed an evaluation of Pichardo as part of his initial application for benefits. (R. 130-35, 141-47.) Dr. Juriga assessed that Pichardo had moderate limitations in understanding, remembering or applying information; interacting with others; and concentrating, persisting or maintaining pace; and a mild limitation in adapting and managing himself. (R. 132-33.) Based on the evidence in the record as of the date of his assessment, including the report of Dr. Nikkah, Dr. Juriga opined that Pichardo retained the capacity to perform the basic mental demands of unskilled work. (R. 133-34.)

### F.    <u>March 2017 Through November 2017 Treatment Records – New York State Psychiatric Institute</u>

On March 24, 2017, Pichardo visited Dr. Kirsch for medication management. (R. 1682.) Pichardo reported feeling overwhelmed by life, having to find an apartment and living in a shelter.

(*Id*.) Pichardo informed Dr. Kirsch that he had received his work authorization document. (*Id*.) Dr. Kirsch spoke with Pichardo about life goals and positive developments in his life, including receiving his work authorization and assistance with renting an apartment. (*Id*.) Pichardo stated that he preferred to get disability benefits. (*Id*.) Pichardo stated that he felt beaten down by his experience from the previous 10 years and did not feel he could work anymore, referring to his difficulty with concentration. (*Id*.) Pichardo informed Dr. Kirsch that he had taken more Adderall than he was prescribed at times. (*Id*.) Pichardo also reported experiencing disturbed sleep in the morning without two doses of Trazodone at night, apparently due to the noise in the shelter. (*Id*.) Pichardo reported that he had a good energy level, but it dropped following the effects of Adderall. (*Id*.) He stated that his mood was fine and that he had a good appetite. (*Id*.) He denied auditory hallucinations or suicidal ideation. (*Id*.) Dr. Kirsch noted that Pichardo showed a hand tremor during the visit. (*Id*.) Pichardo stated that he noticed the tremor when the Adderall wore off. (*Id*.)

On April 10, 2017, Pichardo visited Dr. Kirsch for medication management. (R. 1685.) Pichardo stated that he felt that the extended-release form of Adderall was not working for him. (*Id*.) He described feeling "desperate about not getting disability [benefits] and living in the shelter." (*Id*.) He reported that his energy was "hyperactive." (*Id*.) Dr. Kirsch told Pichardo that he had not done well in the homeless shelter system and that he would benefit from renting a room in an apartment until he found his own. (*Id*.) Dr. Kirsch discussed with Pichardo that, even though he was dependent on the shelter to obtain the benefits that Pichardo felt he deserved, it caused him a great deal of stress and made him feel "desperate." (*Id*.) Pichardo reported that his sleep had improved slightly. (*Id*.) Dr. Kirsch discussed with Pichardo medication options, including

increasing his dose of Adderall or trying a different medication, Vyvanse. (*Id*.) On mental status examination, Dr. Kirsch noted that Pichardo's mood was "ok"; his affect was irritable; his thought process was linear, but focused on medication and his hyperactivity; his insight was fair-poor; and his judgement was fair. (*Id*.)

A few days later, on April 13, 2017, Pichardo saw Dr. Kirsch for a follow-up appointment. (R. 1688.) Dr. Kirsch reported that he received authorization to start Pichardo on Vyvanse, but Pichardo wished to continue using Adderall. (*Id*.) Dr. Kirsch also noted that, during the mental status examination, Pichardo's eye contact was intermittent and he was focused on his phone and pictures of different shapes and colors of ADHD pills. (*Id*.) Dr. Kirsch further noted that Pichardo's mood was "ok"; his affect was much less irritable; his thought process was linear, but focused on medications and his hyperactivity; he showed no evidence of extrapyramidal symptoms or abnormal involuntary movement other than his hand tremor; his insight was fair poor and judgment was fair. (*Id*.) Dr. Kirsch continued Pichardo's medications. (*Id*.)

Pichardo next saw Dr. Kirsch on May 8, 2017 for medication management. (R. 1690.) He reported doing well overall. (*Id*.) He complained about his life at the homeless shelter, but said that he preferred staying at the shelter until he found an apartment where he could live by himself. (*Id*.) He stated that some moments he gets "down about [his] situation." (*Id*.) He reported his sleep was improved, he had a good appetite and good energy level. (*Id*.) Dr. Kirsch noted that Pichardo was taking more Adderall than his prescribed dose and that he continued to be reluctant to take Vyvanse, as Dr. Kirsch had recommended. (*Id*.) Pichardo told Dr. Kirsch that he would research Vyvanse (*Id*.) Pichardo asked for a higher dose of the immediate release form

of Adderall. (*Id*.) Dr. Kirsch noted he was very reluctant to go beyond the FDA limits for Adderall, given Pichardo's poor impulse control and lack of reliability. (R. 1691.)

On June 1, 2017, Pichardo visited Dr. Kirsch for medication management. (R. 1692.) Dr. Kirsch discussed with Pichardo the issue of Pichardo's lack of following up with appointments. (*Id*.) Pichardo explained that living in a homeless shelter made it difficult for him to remember appointments that were written on cards. (*Id*.) Dr. Kirsch spent part of the session teaching Pichardo how to use the appointment calendar on his mobile phone to enter appointments on lab work information. (*Id*.)  Dr. Kirsch noted that, while Pichardo reported doing well overall, he continued to experience the same mood fluctuations stemming out of frustrations with his life at the homeless shelter. (*Id*.)  Pichardo stated that his energy level, appetite and sleep were good. (*Id*.)  Dr. Kirsch continued Pichardo's medications. (*Id*.)

On July 10, 2017, Pichardo visited Dr. Kirsch for medication management. (R. 1694.) Dr. Kirsch noted that Pichardo continued his pattern of missing appointments and walking in when he wished. (*Id*.) Pichardo continued to complain about the difficult conditions of his life at the homeless shelter, showing Dr. Kirsch a video of a person that Pichardo claimed was a heroin addict. (*Id*.) Dr. Kirsch stated that he discussed Pichardo's search for an apartment and reminded him of the fact that, since he had received his work authorization, he could have been working and earning money to afford an apartment. (*Id*.) Pichardo also reiterated that the biggest stressors for him were his life at the shelter and his application for disability benefits, and that he might be better equipped to focus on the stressors of finding work if he was living in his own apartment. (*Id*.)  Dr. Kirsch noted that Pichardo continued to have a good appetite, sleep and energy level. (*Id*.)  Dr. Kirsch continued Pichardo's medications. (*Id*.)

Pichardo began seeing Dr. Lauren Havel in August 2017. (R. 1696.) On August 8, 2017, Dr. Havel briefly saw Pichardo in the waiting room, four days after he missed his appointment scheduled for August 4, 2017. (*Id*.) Pichardo reported that he was doing well and taking his medication. (*Id.*) Dr. Havel rescheduled his appointment for August 11, 2017 and assisted him in saving her phone number on his phone for future communication. (*Id.*) On August 10, 2017, one day before his scheduled appointment, Pichardo called Dr. Havel to cancel, explaining that he was tired from a housing appointment and had to commute downtown to continue searching for an apartment. (R. 1697.) During the call, Dr. Havel rescheduled Pichardo's appointment and emphasized to him the importance of adhering to medical appointments. (*Id*.)

On August 22, 2017, Pichardo saw Dr. Havel for medication management. (R. 1698.) Pichardo told Dr. Havel that he was growing increasingly frustrated and depressed because of the living conditions at the homeless shelter. (*Id*.) He described his stressors as "drops filling a cup and eventually the cup overflows." (*Id*.) Pichardo initially asked to be hospitalized in order to get a reprieve from his stressors, but eventually expressed that he understood that hospitalization was not the solution to his problems. (*Id*.) Dr. Havel noted that Pichardo reported experiencing worsening insomnia, low mood, ruminative thoughts about his life, and existential thoughts "(e.g. 'what am I living for')" but he denied having a specific suicidal plan or intent, citing his son as a protective factor. (*Id*.) Pichardo stated he was exercising and had a good appetite, but he was experiencing a decrease in his energy level. (*Id*.) Pichardo continued to take his medications as prescribed and found them beneficial, but he asked for an increase in his antidepressant dose. (*Id*.) Dr. Havel wrote that Pichardo continued to be interested in finding his

own apartment and working again one day. (*Id*.) He also was willing to work with an outpatient team and continue to address stressors, and he asked to meet with a case manager. (*Id*.)

On mental examination, Dr. Havel reported that Pichardo was well-groomed, casually dressed and showed no psychomotor agitation or retardation; he had a linear thought process, was fluent in his speech, and made appropriate eye contact; he displayed no abnormal movements or psychomotor disturbance except for a mild tremor; his mood was "depressed" and affect was mildly constricted; he was content perseverative on the past, had fleeting passive suicidal ideation, but no active suicidal ideation, intent or plan; he denied having auditory or visual hallucinations or delusions; and he had fair-poor insight and fair judgment. (R. 1698.)

Dr. Hovel noted that Pichardo had a history of depressive symptoms that were likely best explained by adjustment disorder along with major depressive disorder and ADHD combined, personality disorder not otherwise specified with narcissistic, borderline and antisocial traits. (R. 1698.) She further noted that Pichardo was benefitting from medication management and supportive psychotherapy, but he was experiencing increasing depressive symptoms associated with continued psychosocial stress and disappointment and a transition to a new medical doctor. (*Id*.) For Pichardo's treatment plan, Dr. Havel increased his dose of Sertraline to 300 mg and continued his 20 mg dose of Adderall and 800 mg dose of Gabapentin. (*Id*.) She recommended that he meet with a case manager the following week to discuss his plans and review potential support services. (*Id*.)

On September 26, 2017, Pichardo called Dr. Havel requesting a refill of his medications. (R. 1700.) Dr. Havel informed him that she could not refill his medications without an appointment. (*Id*.) Pichardo expressed having difficulty reporting to the clinic because he was

living in a homeless shelter in Brooklyn. (*Id.*) Dr. Havel scheduled an appointment for the next day, but three hours before his appointment on September 27, 2017, Dr. Havel received a message from Pichardo informing her that he was not able to come in for his appointment. (*Id.*) Dr. Havel called Pichardo and offered an appointment for the following week, on October 4, 2017. (*Id.*)

On October 4, 2017, Dr. Havel noted that Pichardo did not return her call to confirm or reschedule his appointment for that day, but he left a voice message on September 29, 2017 requesting to have his "psychiatric information" faxed to a housing agency. (R. 1701.) When Dr. Havel reached Pichardo by phone, he told her that he was not coming to the clinic because of another obligation and gave her the phone number of the staff member at the housing agency. (*Id.)* Dr. Havel told him that she would not send his medical information to the housing agency without getting his consent in person. (*Id.*) Pichardo promised to call at a later time to schedule an appointment for the following week. (*Id.*)

On October 24, 2017, two months after his last visit to the clinic, Pichardo visited Dr. Havel without having an appointment. (R. 1702.) Pichardo said he was transferred to a shelter in Brooklyn after he turned down two housing placements from The Bowery Residents' Committee shelter in midtown Manhattan, explaining that he preferred having a studio or a one-bedroom apartment over living in a room. (*Id.*) Dr. Havel noted that Pichardo continued to report depressive symptoms and frustration with his situation, but he was experiencing a mild improvement with a dose of 300 mg of Sertraline. (*Id.*) Pichardo denied suicidal ideation. (*Id.*) He had run out of his antidepressant, sleep aid and anxiety medications, and reported that his symptoms had worsened. (*Id.*) He said he was still working towards figuring out his residency

status, which he hoped would help him feel better. (*Id*.) Dr. Havel noted that Pichardo's mood was "depressed[;]" his affect was euthymic, reactive, and he was making jokes. (*Id.*) Dr. Havel increased his Gabapentin dose and continued the rest of his medications. (*Id*.) She recommended that Pichardo engage with his case manager to discuss support services. (*Id*.)

On November 22, 2017, Dr. Havel wrote a progress note in which she stated that Pichardo missed his appointment the day before and left a voicemail asking for medication refills because he was running out. (R. 1704.) Dr. Havel called him back and prescribed a week's worth of medication and asked that he come in for an appointment the following week. (*Id.*) During the call, she pointed out to Pichardo that he tended not to adhere to his monthly appointments when she prescribed his medication refills in this manner. (*Id*.)

On November 28, 2017, Pichardo showed up on time for his appointment with Dr. Havel. (R. 1705.) He informed Dr. Havel that he was likely moving into a studio in the South Bronx the following week and hoped to like the neighborhood. (*Id*.) Dr. Havel noted that Pichardo's mood was "a little better" that he reported having good energy and appetite, and he was enjoying life. (*Id*.) His sleep was improved with the use of Trazodone. (*Id*.) Dr. Havel continued Pichardo's medications. (*Id.*)

### G.   January/February 2018 Treatment Records – New York State Psychiatric Institute

On January 19, 2018, Pichardo saw Dr. Havel for a follow-up appointment. (R. 1707.) He informed Dr. Havel that he obtained a one-bedroom apartment in the Bronx and proudly showed her pictures of it. (*Id*.) Pichardo reported that he was sleeping and eating better, but he continued to feel "down" due to loneliness and not having a girlfriend. (*Id*.) He reported taking up to 300 mg of Trazodone some nights to sleep, but denied feeling hung over or sedated. (*Id*.) Dr. Havel

noted that Pichardo's mood was "okay" and observed that he showed further improvement after he obtained his housing arrangement, adding that was still experiencing some residual low mood and "emptiness" that were likely secondary to personality organization. (*Id.*) Dr. Havel increased Pichardo's dose of Trazodone and continued the rest of his medications. (*Id.*)

On February 21, 2018, Pichardo visited Dr. Havel for a follow-up appointment. (R. 1709.) He reported enjoying decorating his apartment, taking an English class at the library and meeting new people. (*Id.*) He spoke of hopes of obtaining his GED and taking courses on car electrical system repair. (*Id.*) Additionally, he said he was continuing to work on obtaining his immigration status and benefits. (*Id.*) He reported being in a good mood and sleeping well. (*Id.*) On mental status examination, Dr. Havel noted that Pichardo's mood was "fine[;]" his affect was euthymic and reactive; and he was making jokes. (*Id.*) She further noted that he was content perseverative on the past and had a fleeting passive suicidal ideation, but no active suicidal ideation, intent or plan. (*Id.*) Dr. Havel continued his medications and recommended that he return a month later for a follow-up appointment. (*Id.*)

**H.**   **March 20, 2018 Intelligence Examination – Dr. John Miller, Ph.D.**

On March 20, 2018, Pichardo presented to Dr. Miller for an intelligence evaluation.[7] (R. 950-62.) Dr. Miller observed that Pichardo was casually and appropriately dressed; had good hygiene, normal posture, normal motor behavior and appropriate eye contact; and he had adequate speech and language skills. (R. 952.) Dr. Miller noted that Pichardo was superficially cooperative. (*Id.*) Pichardo's style of responding was deliberate, orderly and self-correcting. (*Id.*)

---

[7] Dr. Miller noted that "[t]he results of the evaluation [were] considered to be invalid because of what appeared to be [Pichardo's] pattern of uncooperative responding. (R. 952.)

Dr. Miller noted that Pichardo displayed good attention and concentration, and showed no evidence of significant emotional distress during the evaluation. (*Id*.) Pichardo claimed that he was experiencing auditory hallucinations and paranoid ideation. (R. 956.) Although Pichardo scored 71 on the intelligence test,[8] which put him into the borderline range of intellectual functioning, Dr. Miller noted that the test results were not valid because they were inconsistent with Pichardo's stronger performance on training items and with Pichardo's work history, which required him to earn a driver's license, and his reported ability to manage his own money on a regular basis. (R. 952.)

Dr. Miller opined that Pichardo's ability to interact adequately with supervisors, coworkers and the public appeared to be markedly limited. (R. 953.) Pichardo's ability to regulate emotions, control behavior and maintain well-being was moderately limited (*Id*.) He was not limited in his ability to understand, remember or apply simple and complex directions; use reason and judgment to make work-related decisions; sustain concentration and perform a task at a consistent pace; and maintain regular work attendance. (*Id*.) Dr. Miller found that Pichardo's difficulties appeared to be caused by psychiatric problems and lack of motivation, but noted that his psychiatric problems were not significant enough to interfere with his ability to function on a daily basis. (*Id*.) Dr. Miller listed Pichardo's diagnosis as adjustment disorder with depressed mood. (*Id*.)

---

[8] Dr. Miller administered The Test of Nonverbal Intelligence-4 because Pichardo was a Spanish-speaker. (R. 952.)

I.       **April 25, 2018 Medical Expert Testimony – Dr. Chukwuemeka Efobi, M.D.**

On April 25, 2018, Dr. Chukwuemeka Efobi, M.D. testified as a medical examiner at Pichardo's first administrative hearing before ALJ Seth Grossman. (R. 73, 90.) Based on his review of Pichardo's medical records, Dr. Efobi testified that Pichardo had three possible diagnoses, including unspecified depressive disorder; permanent narcissistic and borderline personality disorder; and cocaine abuse disorder. (R. 90-92.) Dr. Efobi discussed Pichardo's treatment records and pointed to several of Dr. Kirsch's treatment notes from 2016 and Dr. Kirsch's February 2017 annual psychiatric evaluation as providing "a very good analysis" of Pichardo's illness. (R. 92 (citing R. 807, 811-13, 828, 846, 857).) According to Dr. Efobi, the records showed that Pichardo was doing well prior to becoming homeless and then struggled due to adjustment issues. (R. 93.) Dr. Efobi testified that the records painted a very different picture than how Pichardo presented that day.[9] (*Id.*)

Dr. Efobi opined that Pichardo a mild limitation in understanding, remembering and applying simple directions and instructions; and a moderate limitations in understanding, remembering and applying complex directions. (R. 94.) In interacting with others, Dr. Efobi found that Pichardo was moderately limited due to his personality disorder. (*Id.*) With respect to Pichardo's ability to concentrate, persist and maintain pace, Dr. Efobi found that Pichardo had only a mild limitation because the prescription of Adderall helped him with concentration. (*Id.*) Dr. Efobi also found that Pichardo had a mild limitation in adapting and managing oneself. (*Id.*)

---

[9] In his testimony at the first administrative hearing, Pichardo presented himself as "hearing voices," "spending the whole day walking back and forth, back and forth" and claustrophobic. (R. 79, 84.)

Dr. Efobi testified that the record showed that Pichardo was stable throughout 2017 and 2018 and that his depression was not chronic. (R. 101-02.) Dr. Efobi also opined that Pichardo did not have a lack of ability to work, he had a lack of motivation. (R. 103.) Dr. Efobi disputed the assessment of Dr. Nikkah, which he described as an "outlier." (R. 108-11.) Dr. Efobi also disputed Pichardo's major depressive disorder diagnosis, opining that Pichardo had an adjustment disorder. (R. 111-12.)

**J.** **May 2018 Through November 2018 Treatment Records – New York State Psychiatric Institute**

On May 22, 2018, Pichardo visited Dr. Havel for medication management. (R. 1711.) He told Dr. Havel that his application for disability benefits was denied, and he was appealing the case. (*Id.*) He reported experiencing fleeting thoughts of giving up. (*Id.*) He further reported that he was feeling "down," "empty," less motivated, and he was less engaged in his previous activities. (*Id.*) He continued to sleep fairly, eat normally, and he denied having psychotic symptoms or suicidal ideation. (*Id.*) He managed to motivate himself to return to the Social Security Office earlier that week to restart the disability application process and look for a private attorney. (*Id.*) He told Dr. Havel that only money could help him feel better. (*Id.*) Dr. Havel noted that Pichardo was resistant to finding ways to work toward feeling better, continuing his English classes, attempting part-time work or exercising. (*Id.*) On mental status examination, Dr. Havel noted that Pichardo's mood was "a little down[;]" his affect was sad but reactive; and he was making jokes. (*Id.*) She further noted that he was content perseverative on the past and had fleeting wishes of being able to give up, but no active suicidal ideation, intent or plan. (*Id.*) Dr. Havel continued Pichardo's medications and recommended that he follow up a month later. (*Id.*)

Pichardo saw Dr. Havel again on June 29, 2018. (R. 1713.) He stated that he had been visiting and planning fun outings with his 14-year-old son for the first time in three years. (*Id.*) Dr. Havel noted that Pichardo's mood was "very good," and he described feeling very happy and enjoying seeing his son grow up and do well. (*Id.*) He reported feeling well, having good energy and sleeping well. (*Id.*)

On July 31, 2018, Pichardo visited Dr. Havel for medication management. (R. 1715.) Pichardo reported experiencing worsening mood, down feelings, hopelessness, anhedonia, feelings of emptiness and anxiety. (*Id.*) He denied suicidal ideation and psychotic symptoms. (*Id.*) Dr. Havel observed that Pichardo's mood was "down," and his affect was constricted. (*Id.*) Pichardo mentioned that a social worker suggested that he try Venlafaxine and Bupropion. (*Id.*) He asked to try a different serotonin reuptake inhibitor medication. (*Id.*) After discussing cross-tapering and the risk of side effects, Dr. Havel prescribed Venlafaxine, reduced the dose of Sertraline, and continued the rest of his medications. (*Id.*)

On August 29, 2018, Pichardo reported a day late to his appointment with Dr. Havel. (R. 1717.) Pichardo expressed seeing an improvement in his mood. (*Id.*) He experienced a boost in his energy, feeling less sad and enjoying what he was doing. (*Id.*) However, Pichardo's insomnia slightly worsened after starting Venlafaxine. (*Id.*) He reported having less trouble sleeping on days in which he was busy or active and took Trazodone. (*Id.*) Pichardo stated that he took double the prescribed dose of Trazodone some nights. (*Id.*) Dr. Havel observed that his mood was "better," and his affect was euthymic. (*Id.*) She told Pichardo that he could improve his insomnia by focusing on sleep hygiene, exercising, getting some sunlight, and avoiding nighttime food

binges. (*Id*.) Dr. Havel increased Pichardo's daily dose of Venlafaxine to 225 mg, further reduced his dose of Sertraline to 100 mg a day, and continued his other medications. (*Id.*)

On September 12, 2018, Pichardo saw Dr. Havel for a follow-up appointment. (R. 1719.) Dr. Havel noted that Pichardo did not adhere to the prescribed doses of Sertraline and Venlafaxine. (*Id.*) Pichardo reported decreased energy. (*Id.*) Dr. Havel noted that Pichardo's mood was "down," and his affect was mildly constricted. (*Id.*) Dr. Havel noted that she discussed behavioral activation with Pichardo and that not adhering to the medication plan was likely contributing to his symptoms. (*Id.*) Dr. Havel discussed ways to manage side effects. (*Id.*) Dr. Havel recommended that Pichardo take a lower dose of Sertraline for a week and then attempt to stop taking it. (*Id.*) She continued his other medications. (*Id.*)

On November 7, 2018, Pichardo saw Dr. Havel again after missing and rescheduling several appointments, claiming he could not remember them and could not get out of bed. (R. 1721.) Pichardo reported restarting Sertraline three days prior and stopped taking Venlafaxine. (*Id.*) He stated that he continued to feel down, empty, depressed, hopeless and angry, in connection with his attempts to obtain disability benefits. (*Id.*) Dr. Havel's mental status examination remained the same as his previous visit. (*Id*.) Dr. Havel noted that Pichardo had not seen his case manager for months, and she accompanied him to her office to seek assistance with communication with his attorney. (*Id.*)

On November 21, 2018, Pichardo visited Dr. Havel to discuss changing his antidepressant. (R. 1723.) He reported taking 400 mg of Sertraline. (*Id*.) He also reported continuing to feel down, anergic, anhedonic, and that he was spending most of his time in bed, eating more than usual. (*Id.*) Pichardo stated that he was having difficulty concentrating and remembering details. (*Id.*)

He said he often felt hopeless, but he felt better when he received good news or a call from a sibling. (*Id.*) Dr. Havel noted that Pichardo's symptoms met the criteria for a major depressive episode. (*Id*.) She discussed alternative antidepressants, including trying a different type of medication. (*Id*.) Dr. Havel's mental status examination remained the same as the prior two visits. (*Id*.) Dr. Havel added a new prescription of Fluoxetine and continued Pichardo's other medications. (R. 1723-24*.*)

K.    **January 2019 Through September 2019 Treatment Records – New York State Psychiatric Institute**

On January 4, 2019, Pichardo visited Dr. Havel without having an appointment. (R. 1725.) He had not started the new prescription for Fluoxetine. (*Id*.) Pichardo reported feeling better after spending New Year's Eve with his family. (*Id*.) He reported no major changes in terms of chronic low mood, insomnia or anxiety. (*Id*.) A mental status examination was largely the same. (*Id*.) With respect to Pichardo's treatment plan, Dr. Havel prescribed a lower dose of Sertraline and a higher dose of Fluoxetine, and she continued the rest of his medications. (R. 1725-26.)

On February 27, 2019, Pichardo visited Dr. Havel for a follow-up appointment. (R. 1727.) Pichardo reported feeling better and less consistently down, but not to the level that he would have liked. (*Id*.) He reported taking Fluoxetine and Sertraline as prescribed. (*Id*.) Dr. Havel noted that she spent the rest of the visit discussing issues related to Adderall, including Pichardo's fixation on a particular brand. (*Id*.) Pichardo claimed he could not find the "right" brand and requested that Dr. Havel increase the dosage, which she declined to do. (*Id*.) A mental status examination was the same as the prior visit. (*Id*.) Dr. Havel discontinued Pichardo's Sertraline prescription, increased his dose of Fluoxetine, and continued the rest of his medications as previously prescribed. (R. 1728.)

21

Pichardo next saw Dr. Havel on May 14, 2019. (R. 1673.) Dr. Havel noted that Adderall helped Pichardo "get out of bed in the morning, stay on task and organized with paperwork," but she also noted that "some days he still spen[t] all day on the couch or in his bed[;]" that he "struggle[d] to follow through with behavioral activation recommendations[;]" and that he had "not been able to follow through on any planned projects such as attending English classes or working due to amotivation and anhedonia." (*Id*.)

On August 21, 2019, Pichardo visited Dr. Havel for medication management, a day after he missed a scheduled appointment. (R. 1730.) Pichardo explained that he missed his appointment because he was too tired to get out of bed and forgot to call to say he was not going to show up. (*Id*.) He stated that he felt "more depressed" and experienced chronic low mood, sleep dysregulation, and feelings of emptiness and dissatisfaction. (*Id*.) He expressed having fleeting thoughts about whether life was worth living, with no suicidal plan or intent. (*Id*.) Pichardo cited a variety of reasons why he was staying home and avoiding meaningful engagement with the world, including fatigue, back pain and boredom. (*Id*.) He also said there was a warrant out for his arrest. (*Id*.) Pichardo said he had no desire to exercise or attend class. (*Id*.) Dr. Havel observed that Pichardo's mood was "down," and his affect was euthymic with a melancholic tinge. (*Id*.) Dr. Havel told Pichardo that medication likely would not address his chronic withdrawal and feelings of emptiness and that it was up to him to find meaning in his life, but Pichardo was persistent in wanting medication. (*Id*.) Dr. Havel noted that, even though Pichardo was able to avoid hospitalization, he continued to struggle with engaging in work, wellness and other activities. (R. 1731.) Dr Havel also noted that Pichardo's goals remained education and employment, but despite having support, he had not been able to utilize the

resources that were available to him. (*Id*.) Dr. Havel added a new prescription for Bupropion and continued the rest of Pichardo's medications. (*Id*.)

On September 20, 2019, Pichardo visited Dr. Havel primarily to have her fill out a form that pertained to his application for disability benefits.[10] (R. 1733.) Pichardo reported that, despite seeing a little benefit from his new medication, he felt "very weak" and was open to an increase in his dose. (*Id*.) Dr. Havel reiterated that medication alone was likely not going to address Pichardo's chronic withdrawal and feelings of emptiness and that it was up to him to find meaning in his life. (*Id*.) During the visit, Pichardo mentioned that he briefly worked as a barback during the previous month and was terminated because he performed poorly and was "talking to himself." (*Id*.) He stated that he used self-castigating statements such as "you idiot you dropped the bottle" or "why are you so clumsy." (*Id*.) Dr. Havel noted that Pichardo had not tried to look for another job and that he continued to feel isolated. (*Id*.) Dr. Havel prescribed a higher dose of Bupropion and continued his other medications. (R. 1734.)

**L.    February 25, 2020 Medical Expert Testimony – Dr. Nicole Mara Martinez, Psy. D.**

Dr. Nicole Mara Martinez, Psy.D., testified at the hearing before ALJ Feuer on February 25, 2020. (R. 1182-99.) Dr. Martinez testified that the treatment records were consistent with major depressive disorder, anxiety disorder, ADHD and personality disorder. (R. 1183.) Dr. Martinez further testified that, based on her reading of the medical records, Pichardo did not meet any of the impairments in the Listings. (R. 1184.) She found that Pichardo met the Paragraph A criteria for depression based on what he reported in consultative exams, noting that there were

---

[10] The record does not contain any formal, written assessment from Dr. Havel prior to the March 3, 2020 Medical Source Statement discussed in Section III(M), *infra*.

some large gaps between visits and some reports of stability. (R. 1185.) She also noted there were fluctuations in Pichardo's anxiety disorder. (*Id*.)

Dr. Martinez testified that she found some discrepancies in Pichardo's medical records. (R. 1187.) For example, Dr. Martinez pointed out that Dr. Han's assessment that Pichardo had limited cognitive, emotional and interpersonal abilities was based on what Pichardo self-reported. (R. 1191.) Dr. Martinez also stated that Dr. Han's notes were inconsistent with notes from the New York State Psychiatric Institute, which showed there was a period in which Pichardo "remained fairly stable." (R. 1194.) Regarding substance abuse, she testified that Pichardo's hospitalization was the result of depression and the record did not indicate that he was admitted because of a combination of depression and substance abuse. (R. 1193.)

Dr. Martinez opined that Pichardo had moderate limitations in understanding, remembering, applying information and adapting or managing oneself. (R. 1186.) Pichardo's limitations in concentrating, persisting and maintaining pace were mild. (*Id*.) In terms of functional limitations, Dr. Martinez concluded that Pichardo was limited in his ability to carry out complex tasks and that he needed written instructions for any tasks that exceeded two to three steps. (R. 1187.) For any tasks that would require additional steps, she suggested that one sheet be available for reference. (*Id*.) Further, Dr. Martinez noted that Pichardo was capable of interacting with the public on an occasional basis and working in close proximity to coworkers. (*Id*.) Dr. Martinez opined that Pichardo could not work in tandem with coworkers or at a production pace, and he could not handle more than occasional changes to his work environment. (*Id*.) Dr. Martinez further testified that she did not see anything in the record that would prevent Pichardo from regular work beyond lack of motivation. (R. 1199.)

**M.**     **March 3, 2020 Medical Source Statement – Dr. Lauren Havel, M.D.**

On March 3, 2020, Dr. Havel provided a medical source statement describing Pichardo's impairments and their impact on his abilities. (R. 1759-62.) Dr. Havel listed the following diagnoses for Pichardo: major depressive disorder with psychotic features, ADHD combined and unspecified anxiety disorder. (R. 1759.) She stated that the psychosocial factors that were associated with Pichardo's diagnoses consisted of a history of trauma, assault, homelessness, unemployment, financial stress, social isolation and family separation, and unresolved immigration status. (*Id*.)

Dr. Havel noted that the symptoms that Pichardo experienced were poor memory, appetite disturbance associated with weight gain, sleep disturbance, mood disturbance, anhedonia or pervasive loss of interest, psychomotor agitation or retardation, feelings of guilt and worthlessness, difficulty thinking or concentrating, suicidal ideation or attempt, social withdrawal or isolation, decreased energy, intrusive recollections of traumatic experience associated with an assault, and somatization unexplained by organic disturbance associated with back pain. (R. 1759.) Additionally, she stated that Pichardo experienced persistently down mood; reduced functioning, including cooking and cleaning; poor executive function; persistently constricted affect; hypophonic speech; difficulty with complex ideas; and poor judgment and motivation. (R. 1760.)

Dr. Havel also listed Pichardo's prescription medications, which were Fluoxetine, bupropion, trazodone, Adderall, and Gabapentin. (R. 1760) Of these medications, Dr. Havel stated that Gabapentin could impact Pichardo's work because it could cause sedation or dizziness.

(*Id*.) She further opined that Pichardo's impairments would cause him to miss work about three times a month on average, and his treatment would cause him to miss work once a month. (*Id*.)

Further, Dr. Havel noted that Pichardo's impairments could impact his ability to perform work-related mental activities. (R. 1760) She noted that Pichardo had a marked loss in his ability to understand and remember detailed instructions; maintain attention and concentrate for extended periods of time; work in coordination with–or proximity to–others without being unduly distracted; and complete a normal workday or week without interruptions from psychologically based symptoms. (R. 1761.) She added that Pichardo had a moderate loss in his ability to carry out detailed instructions; deal with stress or semi-skilled and skilled work; and make simple work-related decisions. (*Id*.)

Dr. Havel also noted that Pichardo had a marked loss in his ability to accept instructions; respond appropriately to criticism from supervisors; and maintain socially appropriate behavior, adding that he was let go from various jobs for unusual self-talk and behavior. (R. 1761.) She further added that he had a moderate loss in his ability to get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes as well as his ability to set realistic goals or make plans independently of others. (*Id*.)

Dr. Havel indicated that Pichardo's mental impairments resulted in a moderate restriction of daily-living activities; marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience an exacerbation of

signs and symptoms. (R. 1762.) Dr. Havel stated that Pichardo's impairments started in 2013, when he was hospitalized for suicidal behavior and had persisted since then. (*Id*.)

## IV.     Plaintiff's Administrative Hearing Testimony

At his first hearing before ALJ Grossman on April 25, 2018, Plaintiff testified that he was fired from his job working in a restaurant because he was talking to himself, forgot things and dropped plates because he was nervous and that he was fired from later jobs for breaking things and/or crashing cars and because he was taking medication. (R. 77-78, 86-89.) Pichardo testified that he only used cocaine once, in October 2016. (R. 79.) During the February 2018 hearing before ALJ Feuer, Pichardo again testified that he had only taken cocaine once. (R. 1188-89.) Pichardo further testified that he could speak some basic conversations phrases in English, but had stopped taking English classes and could not read in English, including, for example, the menu at the restaurant where he had worked. (R. 1199-1201.) Plaintiff did not testify at the July 23, 2020 hearing. (*See* R. 1216-17.)

## V.     Vocational Expert Testimony

Vocational Expert ("VE") Distefano testified during the July 23, 2020 hearing. (R. 1218-27.) The ALJ asked the VE whether there would be jobs in the national economy for a hypothetical person who had no exertional limitations, but was limited to simple routine and repetitive tasks; making simple work-related decisions; with only occasional workplace changes and, to limit stress, no production rate work and no working in tandem with coworkers. (R. 1220.) The VE testified that such person could not perform Pichardo's past work, but would be able to perform the job of silver wrapper, sweeper or icer. (R. 1220-21.) The VE further testified that, if the

individual was limited to only occasional interaction with supervisors, coworkers and/or the general public, he could still perform those three jobs. (R. 1222.)

The ALJ then asked the VE if there were jobs for someone with the same limitations as the prior hypothetical, except that the person was limited to light work. (R. 1221.) The VE testified that such person could perform the jobs of assembler of small products and photocopy machine operator. (R. 1222-23.) The VE also testified that most employers would tolerate 10% of time off task and one absence per month. (R. 1223-24.) In response to questions from Pichardo's attorney regarding tolerance for tardiness, the VE testified that it was very dependent on the employer, but if it happened on a consistent basis would endanger the person's employment. (R. 1224-27.)

## VI. ALJ Feuer's Decision and Appeals Council Review

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, the ALJ found at step one that Pichardo had not engaged in substantial gainful activity since January 9, 2017, the alleged disability onset date. (R. 1148.) At step two, the ALJ determined that the following impairments were severe: depressive disorder, anxiety disorder and substance use disorder. (R. 1149.) At step three, the ALJ found that Pichardo did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ specifically considered listings in sections 12.02, 12.04, 12.06 and 12.11. (*Id.*) With respect to the paragraph B criteria, the ALJ found that Pichardo had no limitation in understanding, remembering and applying information, a moderate limitation in interacting with others, a moderate limitation in concentrating, persisting and maintaining pace and a moderate limitation in adapting or managing oneself. (R. 1149-50.)

The ALJ then assessed Pichardo's residual functional capacity ("RFC"), determining that he could perform light work except he was limited to performing simple, routine, repetitive tasks, and making simple work-related decisions; could tolerate only occasional changes in work processes; was limited to only occasional interaction with coworkers, supervisors and the general public; and, to limit work stress, could not perform at a production-rate pace or work in tandem with coworkers. (R. 1150.) Moving on to step four, the ALJ found that Pichardo was unable to perform his past relevant work as a valet or kitchen helper. (R. 1157-58.) At step five, the ALJ considered Pichardo's age, education and job skill, along with the RFC determination, and, based on testimony from the VE, concluded there were jobs that exist in significant numbers in the national economy that Pichardo could perform including silver wrapper, small products assembler and photocopy operator. (R. 1158.) Therefore, the ALJ found that Pichardo was not disabled during the relevant period and denied his claim for benefits. (R. 1159.)

## LEGAL STANDARDS

### I.  Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) (citing Fed. R. Civ. P. 12(c)). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported

by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

II.   **Determination Of Disability**

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . " 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that he cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51-52.

III.    **The Treating Physician Rule**[11]

An ALJ must follow specific procedures "in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F. 3d 90, 95 (2d Cir. 2019). "First, the ALJ must decide whether a treating physician's opinion is entitled to controlling weight." *See id*. The ALJ must give "controlling weight" to the opinion of a claimant's treating physician as to the nature and severity of the impairment as long as it "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Halloran*, 362 F.3d at 32 ("[T]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, [including] the opinions of other medical experts.").

If the ALJ decides the treating physician's opinion is not entitled to controlling weight, the ALJ must determine how much weight, if any, to give it. *Estrella*, 925 F. 3d at 95-96. "Even if the treating physician's opinion is contradicted by other substantial evidence, and so is not controlling, it may still be entitled to significant weight 'because the treating source is inherently more familiar with a claimant's medical condition than are other sources.'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (quoting *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir. 1988)). In deciding what weight to assign, the ALJ must "explicitly consider" the following,

---

[11] On January 18, 2017, the SSA promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. *See Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence*, 60 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. *Id*. Accordingly, since Plaintiff filed his claims in January 2017, the Court is referring to the version of the regulations effective before March 27, 2017.

nonexclusive factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F. 3d at 95-96 (citing *Burgess*, 537 F.3d at 129) (additional citations omitted).

At both steps, the ALJ must "give good reasons in [his] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them."). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F. 3d at 96 (citing *Selian v. Astrue*, 708 F.3d 409, 419-20 (2d Cir. 2013)). However, if "a searching review of the record" assures the Court "that the substance of the treating physician rule was not traversed," the Court should affirm. *Id*. (citing *Halloran*, 362 F.3d at 32.).

<u>**DISCUSSION**</u>

I.    <u>**The ALJ Did Not Err In Weighing The Medical Opinion Evidence**</u>

A.    <u>**Dr. Havel**</u>

Plaintiff first argues that the ALJ erred in giving little weight to the opinion of Dr. Havel because she was a longtime treating specialist and her opinion was supported by the treatment records and the opinions of Dr. Nikkah (who was consultative examiner) and Dr. Han. (Pl.'s Mem. at 20-24.) The ALJ accorded "little weight" to the medical opinion of Dr. Havel, finding that she "present[ed] a portrait of a claimant that [was] at odds with her treatment records." (R. 1155.) First, the ALJ found that Dr. Havel's statement that Pichardo presented with a consistently down

mood, constricted effect and hypophonic speech overstated the frequency of these characteristics in the record. (R. 1155.) The record itself is somewhat mixed and shows that Dr. Havel described Pichardo's affect as "constricted" or "mildly constricted" in six of the eighteen recorded visits between August 2017 and September 2019 (*see* R. 1698, 1715, 1719, 1721, 1723, 1725) and found that Pichardo's mood was "down" or "depressed" in ten of the eighteen visits during the same time period. (R. 1593, 1698, 1702, 1711, 1715, 1719, 1721, 1723, 1730, 1733.) Nonetheless, in rejecting Dr. Havel's opinion regarding the extent of Pichardo's limitations based on these clinical findings, the ALJ also relied on other evidence in the record.

The ALJ found that Dr. Havel's opinion that Pichardo had marked limitations in maintaining attention and concentration for extended periods, working in coordination with others without being unduly distracted and completing a normal workday or workweek without interruption from psychologically based symptoms, were not supported by treatment records indicating that Pichardo's ability to focus and sustain attention changed when he started taking Adderall.[12] (R. 1155.) The ALJ also relied on the testimony of medical expert Dr. Efobi, who testified that once Adderall became part of Pichardo's daily regimen, Pichardo demonstrated only a mild limitation in his ability to pay attention and that, on Adderall, Pichardo retained the ability to perform simple or even complex tasks so long as he was limited to working in a low-contact work environment. (*Id*.; *see also* R. 1152.) In addition, the ALJ relied on the testimony of medical expert Dr. Martinez, who opined that Pichardo had a mild limitation in sustaining concentration, persistence and pace, but could not perform work at a production pace. (R. 1155;

---

[12] The record indicates that Pichardo started taking Adderall in or around July 2016. (*See* R. 133, 857.)

*see also* R. 1152.) The ALJ also found that Dr. Havel's opinion that Pichardo would experience frequent deficiencies of concentration, persistence and pace did "not square" with her other findings and her opinions[13] and that Pichardo was subject to frequent episodes of deterioration or decompensation in work or work-like settings were not supported by the treatment records, which did not reference any such episodes from February 2017 onward. (R. 1155.)

Although, as Plaintiff argues, the ALJ did not discuss other treatment notes indicating that Pichardo continued to have difficulty concentrating and that, despite the medication, he still struggled to get out of bed some days (*see* R. 1673, 1723), the ALJ was not required to reconcile every conflicting shred of medical evidence. *See Colling v. Barnhart*, 254 F. App'x 87, 88 (2d Cir. 2007) ("Although we will not accept an unreasoned rejection of all the medical evidence in a claimant's favor, the Commissioner need not reconcile explicitly every conflicting shred of medical testimony." (citations omitted)). Considering the record as a whole, the Court finds that the ALJ did not err in affording Dr. Havel's opinion less than controlling weight.[14] *See Halloran*, 362 F.3d 28, 32 (2d Cir.2004) ("Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are

---

[13] Plaintiff also argues that, if the ALJ believed Dr. Havel's opinion to be insufficiently explained or lacking in support, he should have recontacted her for clarification. (Pl.'s Mem. at 24.) However, as the Commissioner argues, the ALJ has discretion to determine the sufficiency of the record and "can decide whether a claimant is disabled based on the evidence he has, even when that evidence is internally inconsistent." *Micheli v. Astrue*, 501 F. App'x 26, 30 (2d Cir. 2012) (citation omitted). Where, as here, the record contained numerous treatment records and medical opinions, the Court finds that the ALJ did not err by failing to recontact Dr. Havel.

[14] As discussed in Discussion Section I(B), *infra*, although the ALJ did not specify the exact weight he assigned to the opinions of the medical experts, he did fully discuss their opinions and the parties agree that his findings show that he gave Dr. Efobi's testimony considerable weight and Dr. Martinez's testimony at least good weight. (Pl.'s Mem. at 30; Comm'r Mem. at 26.)

not consistent with other substantial evidence in the record, such as the opinions of other medical experts."); *see also Ortiz v. Comm'r of Soc. Sec.*, 309 F. Supp. 3d 189, 205 (S.D.N.Y. 2018) ("[T]he opinion of a non-examining medical expert . . . may be considered substantial evidence if consistent with the record as a whole.") (citing cases).

Plaintiff also argues that, even if the ALJ did not assign Dr. Havel's opinion controlling weight, he should have assigned it at least great weight. (Pl.'s Mem. at 23.) At the second step of the treating physician rule, the ALJ must determine how much weight, if any, to assign to the treating physician's opinion, considering the non-exclusive *Burgess* factors, and provide "good reasons" for the weight assigned to the treating physicians' opinion. *See Estrella*, 925 F. 3d at 95-96 (citing *Burgess*, 537 F.3d at 129); *see also Halloran*, 362 F.3d at 32. Here, the ALJ noted that Dr. Havel was a treating specialist and that she had been treating Pichardo since approximately July 2017. (R. 1154.) The ALJ also considered the supportability and consistency of Dr. Havel's opinion by discussing her treatment records and citing to the opinions of the medical experts (R. 1155.) Although the ALJ did not explicitly consider the consistency between her opinion and all the other opinions in the record, such as those from Dr. Nikkah and Dr. Han, as Plaintiff contends (Pl.'s Mem. at 23), the ALJ separately considered these opinions and, as set forth further in Discussion Section I(B) *infra*, it is clear from his decision that the ALJ gave more weight to the opinions of Dr. Efobi and Dr. Martinez, which he found more consistent with the record as a whole, than to the more restrictive opinions of Dr. Havel, Dr. Nikkah and Dr. Han. (R. 1152-53, 1156.) Thus, a searching review of the record indicates that the substance of the treating physician rule was not traversed.

Moreover, the ALJ's RFC determination, which limited Pichardo to simple, routine, repetitive tasks and only occasional interactions with coworkers, supervisors and the public and excluded working in tandem with others, effectively accounts for many of Dr. Havel's more restrictive findings, including her opinion that Pichardo would have a marked limitation in understanding, remembering and applying complex instructions and a marked limitation in social functioning. *See, e.g., Natrella v. Comm'r of Soc. Sec.*, 19-CV-01237 (SDA), 2020 WL 1041067 at *5-6 (S.D.N.Y. March 3, 2020) (extreme limitation in interacting appropriately with others accommodated by RFC limiting plaintiff to only occasional interaction with supervisors, co-workers and the public); *see also Molly C. v. Comm'r of Soc. Sec.*, No. 20-CV-1376S, 2022 WL 1679413, at *5 (W.D.N.Y. May 26, 2022) (marked limitations in interacting with supervisors accommodated by limitation to occasional contact); *Nathan P. v. Comm'r of Soc. Sec.*, No. 19-CV-00954 (HKS), 2021 WL 1139849 (W.D.N.Y. Mar. 25, 2021) ("More specifically, a moderate limitation in a plaintiff's ability to accept instructions and respond appropriately is consistent with an RFC limiting plaintiff to unskilled work.").

**B.    Other Medical Opinion Evidence In The Record**

The Court also finds that the ALJ did not err in weighing the other medical opinions in the record. (Pl.'s Mem. at 24-30.) Plaintiff first contends that the ALJ erred by failing to specify the weight he assigned to the opinion of Dr. Han and by failing to consider the opinion of Dr. Spinelli. (*Id*. at 24.) However, "[a]n ALJ's failure to explicitly afford an opinion weight does not constitute error if the ALJ's weight determination can be inferred from the decision." *Withus v. Saul*, No. 18-CV-10923 (VSB) (JLC), 2021 WL 2012270, at *8 (S.D.N.Y. May 19, 2021); *see also Berry v. Comm'r of Soc. Sec.*, No. 14-CV-03977 (KPF), 2015 WL 4557374, at *14 (S.D.N.Y. July 29, 2015) ("an ALJ's

failure to state expressly the weight given to the opinion of a consultative source does not require

reversal, so long as the ALJ took the evaluation into account in determining a claimant's RFC.").

Here, the ALJ discussed Dr. Han's opinion regarding cognitive limitations, limitations in

tolerating stress and forgetfulness and found them consistent with an RFC that limited Plaintiff

to simple, routine work with simple work-related decisions, no production rate pace, only

occasional changes in work processes and only occasional interaction with others. (R. 1152-53.)

The ALJ also addressed Dr. Han's opinion regarding Pichardo's need to take frequent breaks, but

found it inconsistent with other evidence in the record, including the testimony of Dr. Martinez.

(R. 1152.) Thus, it can be inferred from the record that the ALJ gave Dr. Han's opinion some

weight, to the extent he found it consistent with the record as a whole. *Accord Camille v. Colvin*,

652 F. App'x 25, 28 (2d Cir. 2016) (affirming denial of benefits when Court could infer weight

attributed to opinion based on ALJ's decision). Moreover, any error to consider Dr. Spinelli's

opinion was harmless since, given the fact that her opinion mirrored that of Dr. Han. (*Compare*

R. 656-59 *with* R. 670-76; *see also* Pl.'s Mem. at 25 (noting assessments are "almost identical").)

There is no reasonable likelihood that consideration of the opinion would have changed the ALJ's

determination. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (failure to consider doctor's

report harmless when "no reasonable likelihood" that consideration would have changed ALJ's

determination).

Plaintiff next argues that the ALJ erred by giving Dr. Nikkah's opinion no weight and by

rejecting the portion of Dr. Miller's opinion that Pichardo had a marked limitation in interacting

with others. (Pl.'s Mem. at 26-28.) Plaintiff further argues that the ALJ erred by giving more

weight to the opinions of the non-examining medical experts. (*Id*. at 30.) It is well settled,

however, that the ALJ may "choose between properly submitted medical opinions[.]" *Heaman v. Berryhill*, 765 F. App'x 498, 500 (2d Cir. 2019) (quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)). The ALJ considered Dr. Nikkah's opinion and reasonably concluded that other opinions were more consistent with the record as a whole. (*See* Comm'r Mem. at 19-20.) Similarly, the ALJ reasonably rejected Dr. Miller's finding of marked limitation in social functioning, which he found inconsistent with other substantial evidence in the record. [15] Moreover, "a non-examining physician's opinion may constitute substantial evidence to support an ALJ's findings." *Nusbaum v. Kijakazi*, No. 20-CV-04488 (VF), 2023 WL 1466637, at *17 (S.D.N.Y. Feb. 2, 2023) (citing *Camille*, 652 F. App'x at 28 (2d Cir. 2016) (explaining that ALJ was permitted to deem the non-examining State agency consulting psychologist's opinion more reliable)). In sum, it was within the ALJ's discretion to weigh the numerous medical opinions in the record and to resolve the conflicts between them in the manner he did. *See Malone v. Comm'r of Soc. Sec.*, No. 21-CV-01928 (GBD) (SDA), 2022 WL 4134368, at *11 (S.D.N.Y. Aug. 6, 2022), *report and recommendation adopted*, 2022 WL 4134510 (S.D.N.Y. Sept. 12, 2022) (citing *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 492 (S.D.N.Y. 2018) (ALJ properly could conclude one physician's findings were inconsistent with those of other physicians, and it "was within the ALJ's discretion to resolve such conflicts between medical opinions in the manner he did" (citations omitted))). [16]

---

[15] In any event, as set forth above, the ALJ's RFC determination is consistent with even a marked limitation in social functioning. (*See also* Comm'r Mem. at 22 n.18.)

[16] Accordingly, there is no merit to Plaintiff's argument that "[h]ad the ALJ properly evaluated the medical opinion evidence he would have found that [Pichardo] had at least marked limitations in all four [Paragraph B criteria]." (Pl.'s Mem. at 31-34.) The medical opinions, weighed as they were by the ALJ, support the ALJ's determination that Pichardo did not meet or equal a Listing. (*See* Comm'r Mem. at 31-32.)

II.     **The ALJ's Consideration Of Paragraph B Criteria In RFC Assessment**

Next, Plaintiff argues that the ALJ's RFC assessment was inconsistent with his determination that Pichardo had moderate limitations in concentration, persistence and maintaining pace or adapting and managing oneself. (Pl.'s Mem. at 34-36.) Plaintiff argues that limiting Plaintiff to simple, routine, repetitive tasks at a non-production rate pace addressed only pace, and not concentration or persistence. (*Id*. at 34.)

First, "to the extent Plaintiff contends that the ALJ was required to expressly include the moderate limitations (in concentration, persistence and pace) identified at Step 3 in the RFC determination, such argument lacks merit because the ALJ's findings at step 3 of the sequential analysis are not an RFC determination." *Rivera v. Kijakazi*, No. 21-CV-01193 (CS) (JCM), 2022 WL 6247492, at *30 (S.D.N.Y. May 13, 2022), *report and recommendation adopted in relevant part*, 2022 WL 4482374 (S.D.N.Y. Sept. 27, 2022) (quoting *Pidgeon v. Comm'r of Soc. Sec.*, 15-CV-06578 (CJS), 2017 WL 4680412, at *7 (W.D.N.Y. Oct. 18, 2017)); *see also Reeves v. Comm'r of Soc. Sec.*, 19-CV-07075 (WKS), 2020 WL 4696589, at *3 (W.D.N.Y. Aug. 13, 2020) ("[T]he special technique used at steps two and three . . . is not an RFC assessment at step four. The ALJ may take the same information finding a moderate limitation for 'paragraph B' criteria and conclude that Plaintiff's functional capacity is not impaired by that moderate limitation.").

Moreover, the ALJ addressed evidence regarding attention, concentration and persistence and reasonably concluded, based on the treatment records and expert testimony, that no further restrictions in the RFC were warranted. (R. 1150-57.) For example, the ALJ considered evidence regarding whether Pichardo would require more frequent breaks, but found that he would require no more than the standard number. (R. 1152.) The ALJ also limited Plaintiff

to work simple, routine work at a non-production pace with only occasional contact with others and non tandem work. (R. 1150; *see also* 1152 (Dr. Efobi testimony limiting Pichardo to low contact environment).) Courts routinely find that similar limitations are sufficient to account for moderate limitations in concentration, persistence and pace. *See, e.g.*, *Moss v. Comm'r of Soc. Sec.*, No. 21-CV-01352 (JCM), 2022 WL 4365349, at *16-17 (S.D.N.Y. Sept. 20, 2022) (rejecting similar argument and finding RFC determination limiting plaintiff to simple, routine, repetitive tasks with low-stress job sufficiently accounted for moderate limitations in concentration and persistence, as well as pace); *McMillian v. Comm'r of Soc. Sec.*, No. 20-CV-07626 (KHP), 2022 WL 457400, at *6 (S.D.N.Y. Feb. 15, 2022) (same).

Plaintiff argues that the ALJ similarly erred in failing to incorporate moderate findings in adapting and managing oneself. (Pl.'s Mem. at 35.) This area of mental functioning refers to the abilities to regulate emotions, control behavior and maintain well-being in a work setting. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(4). "Limitations in work complexity and in interpersonal interaction are often imposed to address a claimant's limitations in adaptive categories of functioning." *Platt v. Comm'r of Soc. Sec.*, 588 F. Supp. 3d 412, 422 (S.D.N.Y. 2022) (citation omitted). The ALJ accounted for these limitations by limiting Pichardo to simple routine work with only occasional interactions with others and not working in tandem with others. *Accord Platt*, 588 F. Supp. 3d at 422 (RFC limiting plaintiff to "simple routine work" with only occasional and superficial interaction with general public and coworkers sufficiently accounted for moderate limitations in adjusting and managing oneself) (citing cases). Thus, the Court finds that the ALJ reasonably accounted for moderate limitations in concentration, persistence and maintaining pace or adapting and managing oneself in his RFC determination.

**III.** <u>**The ALJ's Consideration Of Time Off Task/Absenteeism**</u>

Plaintiff also argues that the ALJ failed to consider time off task or absenteeism in reaching his RFC determination. (Pl.'s Mem. at 36-37.) However, the ALJ considered the conflicting evidence in the record regarding Pichardo's ability to stay on task and whether he had any limitations in regular attendance at work. (R. 1149, 1152-57.) Although Plaintiff points to evidence to supports a greater restriction, other evidence in the record supports the ALJ's determination, including the opinion of psychological consultant Dr. Juriga, Dr. Efobi's testimony and Dr. Miller's opinion that that Pichardo was not significantly limited in his ability to maintain attendance and sustain a routine. (*See, e.g.*, R. 132, 953.) Where, as here, substantial evidence supports the ALJ's RFC determination, the Court may not re-weigh the evidence. *See Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 642 (S.D.N.Y. 2019) ("the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation.").

**IV.** <u>**The ALJ Properly Relied On The VE's Testimony**</u>

Plaintiff argues that the ALJ erred in relying on the VE's testimony that there were jobs in the national economy that Pichardo could perform because each of the jobs identified required Level 1 language abilities[17,18] and also argues that there is not substantial evidence in the record

---

[17] "Each job description in the D.O.T. includes General Educational Development ('GED') levels rated between '1' and '6' pertaining to reasoning, mathematical and language development." *Garcia v. Comm'r of Soc. Sec.*, No. 20-CV-07539 (PAE) (SLC), 2022 WL 1051134, at *14 n.15 (S.D.N.Y. Jan. 31, 2022), *report and recommendation adopted*, 2022 WL 970566 (S.D.N.Y. Mar. 31, 2022) (citing Appendix C–Components of the Definitional Trailer, Dictionary of Occupational Titles, 1991 WL 688702 (4th ed. 1991)).

[18] Level 1 is "the most basic of the levels used in the DOT[.]" *Garcia*, 2022 WL 1051134, at *14. Level 1 language skills require, *inter alia*, "[r]ecogniz[ing] meaning of 2,500 (two- or three-syllable) words;

to support a determination that Pichardo had the required language abilities. (Pl.'s Mem. at 37.) In response, the Commissioner argues that changes in the SSA's regulations, effective April 27, 2020, have rendered this argument obsolete, by removing the ability to communicate in English from the list of educational factors to be considered at step five.[19] (Comm'r Mem. at 34-35 (citing 20 C.F.R. §§ 404.1564(b)(1)-(4), 416.964(b)(1)-(4)).) Plaintiff contends that the ALJ's step five finding still included an implicit determination that Pichardo had the language skills set forth in the DOT. (Pl.'s Reply Mem. at 8-9.) The Court finds no error in the ALJ's step five determination. Contrary to Plaintiff's assertion that ALJ implicitly found that he could read at the rate of 95-120 words per minute or recognize 2,500 words in English, the ALJ made no such determination and he was not required to make such determination.

The ALJ found that Pichardo had a "limited education" under the applicable regulations (R. 1158), which means "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs." 20 C.F.R. § 404.1564. The SSA "generally consider[s] that a 7th grade through the 11th grade level of formal education is a limited education." *Id*. As explained by the Commissioner (Comm'r Mem. at 34-35), the ALJ was not required to assess Plaintiff's ability to speak, read or understand English, which is no longer relevant to the assessment of education as a vocational factor. *See* 20 C.F.R. § 404.1564; *see also* SSR 20-01p,

---

[r]ead[ing] at rate of 95-120 words per minute, [p]rint[ing] simple sentences containing subject, verb, and object, and series of numbers, names, and addresses[,] [and] [s]peak[ing] simple sentences, using normal word order, and present and past tenses*." Id.* at 14 n.16.

[19] The revised regulations apply to claims that were pending on or after the effective date of April 27, 2020. *See* Social Security Ruling, SSR 20-01p: How We Determine an Individual's Education Category, 85 Fed. Reg. 13692-02, *available at* 2020 WL 1083309 (Mar. 9, 2020).

2020 WL 1083309 ("When determining the appropriate education category, we will not consider whether an individual attained his or her education in another country or whether the individual lacks English language proficiency . . . [n]either the country in which an individual was educated nor the language an individual speaks informs us about whether the individual's reasoning, arithmetic, and language abilities are commensurate with his or her formal education level."). As one court noted, "[w]hen finalizing the regulation amendment, the [SSA] explained that changes in the national economy indicate that employment rates for people with limited English proficiency have increased since 1980, which suggests that English proficiency is no longer a useful category describing a claimant's 'educational attainment or of the vocational impact of an individual's education for the purposes of our programs,' as it was in 1978, when the former regulation was written." *Salimeh N. v. Comm'r of Soc. Sec.*, No. C21-1523 (SKV), 2022 WL 1963719, at *4 (W.D. Wash. June 6, 2022) (citing *Removing Inability to Communicate in English as an Education Category*, 85 Fed. Reg. 10,586-01, 10,587, *available at* 2020 WL 885690 (Feb. 25, 2020)). Thus, the ALJ was not required to make a finding regarding Plaintiff's ability to communicate in English and there is no merit to Plaintiff's contention that he implicitly did so.[20] *Accord Vang v. Comm'r of Soc. Sec.*, No. 21-CV-00488 (SAB), 2022 WL 17812859, at *6 (E.D. Cal. Dec. 19, 2022) ("Plaintiff has cited no authority requiring an ALJ to address English proficiency

---

[20] On reply, Plaintiff suggests that the ALJ's finding that Pichardo had the requisite reading capability in any language was not supported by substantial evidence. (Pl.'s Reply Mem. at 9.) However, substantial evidence supports the ALJ's determination that Pichardo had a limited education. (*See, e.g.*, R. 307 (Disability Report indicating Pichardo completed 11th grade).) "[C]ourts have noted that Language Level 1 corresponds with a third grade reading level." *Villalobo v. Saul*, No. 19-CV-11560 (CS) (JCM), 2021 WL 830034, at *24 (S.D.N.Y. Feb. 9, 2021). The Court also is mindful that Pichardo's past work was at the Language Level 1 and 2 levels. *Accord* SSR 20-01p, 2020 WL 1083309 (past work experience can be evidence of educational ability).

limitations in an RFC assessment or a VE hypothetical under the current regulatory scheme" and "recent agency guidance suggests that such a consideration would be inappropriate"). Moreover, because the ALJ did not make a finding regarding Plaintiff's ability to communicate in English, there is no conflict with the DOT.[21]

Further, "[t]he agency's explanation for the regulation amendment also directly responds to [the] concern that any VE would testify that language proficiency affects job placement, as reflected in the DOT's use of a language component as part of a job definition." *Salimeh*, 2022 WL 1963719, at *4 (*citing* 85 Fed. Reg. 10586-01, 10,591). In responding to comments to the proposed change in regulations, the SSA explained that the fact that the DOT includes a language component is not dispositive, because the DOT has always included this component and yet even under the prior rules, the inability to communicate in English "has no impact on disability determinations for claimants under age 45[,]" which "underscores that the ability to communicate in English is not an influencing factor as a matter of general principle." 85 Fed. Reg. 10586-01, 10,591. Accordingly, the Court finds no error in the ALJ's reliance on the VE's testimony at step five.

---

[21] The Court notes that, except in the speaking requirement of Language Level 3, the DOT itself makes no reference to English as the required language. *See* DOT Appendix C, 1991 WL 688702.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's motion is DENIED and the Commissioner's cross-motion is GRANTED. The Clerk of Court is respectfully requested to enter judgment and close this case.

**SO ORDERED.**

Dated:        New York, New York
              March 22, 2023

                                        _____
                                        STEWART D. AARON
                                        United States Magistrate Judge